IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL  DIVISION

| | | |
|---|---|---|
| MARY E. LINDSTROM, on behalf of herself and all others similarly situated, | * * * * | 4:06-cv-00474 (LEAD CASE) |
| Plaintiff, | * * | |
| v. | * * | |
| CITY OF DES MOINES, IOWA, | * * | |
| Defendant. | * * | |
| RICHARD W. CURTIS, on behalf of himself and all others similarly situated, | * * * | 3:06-cv-00106 |
| Plaintiff, | * * | |
| v. | * * | |
| CITY OF BETTENDORF, IOWA, | * * | |
| Defendant. | * * | |
| LANCE E. HOWARD, on behalf of himself and all others similarly situated, | * * * | 3:06-cv-00107 |
| Plaintiff, | * * | |
| v. | * * | |
| CITY OF DAVENPORT, IOWA, | * * | |
| Defendant. | * * | |
| KATHLEEN SWEISBERGER, on behalf of herself and all others similarly situated, | * * * | 4:06-cv-00533 |
| Plaintiff, | * | |

|  | * |  |
| v. | * |  |
|  | * |  |
| CITY OF SIOUX CITY, IOWA, | * |  |
|  | * |  |
| Defendant. | * |  |
|  | * |  |

|  | * |  |
| ROBERT P. KLIEMAN, on behalf of himself and all others similarly situated, | * | 4:06-cv-00531 |
|  | * |  |
| Plaintiff, | * |  |
|  | * |  |
| v. | * |  |
|  | * |  |
| CITY OF WATERLOO, IOWA, | * |  |
|  | * |  |
| Defendant. | * |  |
|  | * |  |

|  | * |  |
| J. THOMAS ZABER, on behalf of himself and all others similarly situated, | * | 4:06-cv-00534 |
|  | * |  |
| Plaintiff, | * |  |
|  | * |  |
| v. | * |  |
|  | * |  |
| CITY OF DUBUQUE, IOWA, | * |  |
|  | * |  |
| Defendant. | * |  |

|  | * |  |
| VERLIS M. MILLER, on behalf of himself and all others similarly situated, | * | 4:06-cv-00532 |
|  | * |  |
| Plaintiff, | * |  |
|  | * |  |
| v. | * |  |
|  | * |  |
| CITY OF CEDAR RAPIDS, IOWA, | * |  |
|  | * |  |
| Defendant. | * |  |
|  | * |  |

Before the Court are several Motions to Remand (hereinafter referred to as a singular "Motion to Remand"), filed by Plaintiffs in the above captioned cases.[1] Defendants resisted the motion, and Plaintiffs replied. A hearing was held on January 3, 2007. The matter is fully submitted.

## I.  BACKGROUND

All seven captioned cases were filed in Iowa state courts and removed to federal court by the respective Defendants. Plaintiffs essentially plead that each is a resident of their respective cities, and each was a customer of cable television services within that city. Each City Defendant currently charges, and has for many years charged, under its franchise agreements and ordinances, a "franchise fee" of up to 5% of the gross revenue for cable television and other services to customers situated within that City.

According to Plaintiffs, this "franchise fee" constitutes a tax and revenue-generating measure which has been and continues to be illegally imposed, exacted, and collected from the Plaintiffs and others similarly situated. As such, Plaintiffs claim the tax is void and should be refunded. Specifically, Plaintiffs rely on the rule in Iowa Code§ 364.3(4), that a City may not levy a tax unless specifically authorized by state law, and the fact that Iowa law does not specifically authorize the Defendants to tax cable television services. Plaintiffs cite a recent

---

[1] A Motion to Remand was filed in the lead case, Lindstrom v. City of Des Moines, on October 17, 2006 (Clerk's No. 3). Shortly thereafter, the Court ordered all seven cases consolidated (Clerk's No. 5). Thus, the Clerk of Court transferred two other pending Motions to Remand, one in Curtis v. City of Bettendorf (Clerk's No. 6), and one in Lance E. Howard v. City of Davenport (Clerk's No. 7) to the docket of the lead case. The Plaintiffs in all seven of the consolidated cases have joined in the various pleadings related to the formally filed Motions to Remand. Accordingly, the Court treats all the pleadings filed by the various Plaintiffs and Defendants as part and parcel of one Motion to Remand, filed by all Plaintiffs in the consolidated case.

Iowa Supreme Court decision, *Kragnes v. City of Des Moines*, 714 N.W.2d 632 (Iowa 2006), in

support of their claim.

## II.  LAW AND ANALYSIS

This Court, as a court of limited jurisdiction, has a duty to assure itself that it has subject

matter jurisdiction in every case.  *See Barclay Square Props. v. Midwest Fed. Sav. & Loan Ass'n*

*of Minneapolis,* 893 F.2d 968, 969 (8th Cir. 1990)*; Sanders v. Clemco Indus.*, 823 F.2d 214, 216

(8th Cir. 1987).   Such jurisdiction must be based on either 28 U.S.C. § 1331, providing that the

"district courts shall have original jurisdiction of all civil actions arising under the Constitution,

laws, or treaties of the United States," or on 28 U.S.C. § 1332, providing that the "district courts

shall have original jurisdiction of all civil actions where the matter in controversy exceeds the

sum or value of $75,000, exclusive of interest and costs, and is between citizens of different

States. . . ."   Defendants removed the individually filed cases on the following basis:

> While the Petition itself makes no Federal Claim, the City is removing on the
> grounds that the Plaintiff's claims for money damages and attorney fees are
> completely preempted under federal cable franchise law and/or Plaintiff's claims
> arise under federal cable franchise law.  Therefore, this case is removed pursuant
> to 28 U.S.C. § 1441(a) and (b) as supported by the common law authority found
> in *Aetna Health Inc. v. Davila*, 542 U.S. 200, 207-08 (2004) and/or *Christianson
> v. Colt Industries Operating Corp.*, 486 U.S. 800, 808-11 (1988).

*See* Clerk's No. 1 (Notice of Removal) at ¶¶ 3-4.[2]

Plaintiffs argue that removal of these cases was improper because Plaintiffs have stated

only a single claim that arises under state law, i.e., whether the Cities can collect the cable

franchise fees, in amounts exceeding the reasonable costs of regulating the activity, without

---

[2] The reference to a singular Plaintiff is because the quoted language comes specifically from the
Notice of Removal filed in *Lindstrom*, prior to consolidation of all seven cases.  The Notices of
Removal in the other six cases are substantially identical.

express authorization by the Iowa Legislature.   According to Plaintiffs, their claim neither arises

under the Federal Cable Communications Policy Act, 47 U.S.C. § 521 et seq. ("Federal Cable

Act"), nor is the claim preempted in whole or in part by the Federal Cable Act, meaning that this

Court lacks subject matter jurisdiction over the action.

### A. *Plaintiffs' Claim*

Plaintiffs' claim is patterned after the claim made in *Kragnes v. City of Des Moines*.  714

N.W.2d at 632.  There, a citizen of the City of Des Moines brought an action alleging that the

franchise fees the city assessed for gas and electric services amounted to illegal taxes.  *Id*. at 633.

In the 1960s, the City of Des Moines entered into franchise agreements with the predecessor to

MidAmerican Energy Company ("MidAmerican") for natural gas and electric services.  *Id*.  The

franchise agreement provided for "an annual franchise, occupation or privilege tax" of one

percent of the gross receipts derived from the company's distribution and sale of electric energy

to customers within the corporate limits of the City, and two percent of the gross receipts from

the company's distribution and sale of natural gas.  *Id*. at 635.   The City negotiated and updated

their franchise agreements for gas and electric service with MidAmerican, extending the

franchises for ten years, and increasing the franchise fee to three percent for gas and three

percent for electricity, effective September 2004.  *Id*.  The increased franchise fees were

imposed, in lieu of a raise in property taxes, to cover the costs of basic city services, such as

police officers, firefighters, and street reconstruction.  *Id*.

The increased franchise fees were so effective in raising funds for the City that in March

2005, the city council resolved to increase the fees to five percent on both gas and electricity,

effective June 1, 2005.  It was during this approximate time-frame that Lisa Kragnes, on behalf

of herself and all others similarly situated, claimed that the franchise fees, charged and collected

by the City through its franchise agreements with MidAmerican, were illegal taxes.  *Id*. at 636.

After extensive analysis of Iowa law, the Iowa Supreme Court remanded the matter to the district

court for a determination of what portion, if any, of the franchise fees were "reasonably related

to the City's administrative expenses in exercising its police power."  *Id*. at 643.  In reaching this

result, the court concluded that "any franchise fee charged by a city must be reasonably related

to the city's administrative expenses in the exercise of its police power.  These expenses include

the reasonable costs of inspecting, licensing, supervising, or otherwise regulating the activity the

city is franchising."  *Id*. at 642.

### B.  *Preemption*

As previously noted, before it may analyze the merits of an action, the Court must first

satisfy itself that it possesses jurisdiction to hear the claim asserted.  The party removing the case

to federal court bears the burden of showing that either diversity or federal subject matter

jurisdiction is present on the facts of the Complaint.  *See McNutt v. General Motors Acceptance*

*Corp.*, 298 U.S. 178, 189 (1936); *Hatridge v. Aetna Cas. & Sur. Co.*, 415 F.2d 809, 814 (8th Cir.

1969); 28 U.S.C. § 1446(a).

Defendants first assert that this Court has federal subject matter jurisdiction because

Plaintiffs' claim is wholly preempted by the Federal Cable Act.  "For federal question

jurisdiction, the federal question generally must appear on the face of the complaint."  *Luecke v.*

*Schnucks Mkts., Inc.*, 85 F.3d 356, 358 (8th Cir. 1996) (citing *Caterpillar, Inc. v. Williams*, 482

U.S. 386, 392 (1987)).  Clearly, nothing on the face of Plaintiffs' Complaint raises a federal

question.  Nonetheless, "[a]n exception to this rule . . . holds that when 'an area of state law has

been completely pre-empted, any claim purportedly based on that pre-empted state law is considered, from its inception, a federal claim, and therefore arises under federal law.'" *Id.* (quoting *Caterpillar*, 482 U.S. at 393); *see Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 8 (2003). "The doctrine of preemption arises from the Supremacy Clause of the Constitution, which requires that state law must give way when it conflicts with or frustrates federal law." *Chapman v. Lab One*, 290 F.3d 620, 624 (8th Cir. (8th Cir. 2004) (citing *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 663 (1993)). "As such, 'complete preemption' of a state-law cause of action provides a basis for removal of an action to federal court." *Id.*; *see also Beneficial Nat'l Bank*, 539 U.S. at 11 (concluding that the National Bank Act provides an exclusive federal cause of action for usury against national banks); *Caterpillar*, 482 U.S. at 393-94 (recognizing the complete preemption doctrine in labor cases involving state law claims preempted by section 301(a) of the LMRA). Accordingly, the Court must determine whether Plaintiffs' state law cause of action is completely preempted by the Federal Cable Act. If the claim is preempted, this Court holds federal subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

Section 542(b) of the Federal Cable Act provides: "For any twelve-month period, the franchise fees paid by a cable operator with respect to any cable system shall not exceed 5 percent of such cable operator's gross revenues derived in such period from the operation of the cable system to provide cable services." 47 U.S.C. § 542(b). Subject to this exception, "any cable operator may be required under the terms of any franchise to pay a franchise fee." *Id.* § 542(a). "Franchise fee" is defined as "any tax, fee, or assessment of any kind imposed by a

franchising authority[3] or other governmental entity on a cable operator or cable subscriber, or both, solely because of their status as such." *Id*. § 542(g)(1).

There is no dispute that, consistent with the federal preemption doctrine, § 556(c) of the Cable Act provides that, except as otherwise provided, "any provision of law of any State, political subdivision, or agency thereof, or franchising authority, or any provision of any franchise granted by such authority, which is inconsistent with this chapter shall be deemed to be preempted and superseded." *Id*. § 556(c).  Defendants assert that this provision provides a basis for complete federal preemption of Plaintiffs' claim because the holding in *Kragnes*, that is, that a franchise fee must be reasonably related to the administrative expenses incurred in the exercise of the franchising authority's police power, is inconsistent with the Federal Cable Act's definition of "franchise fees," i.e., taxes, fees or assessments imposed on a cable operator "solely because of their status as such."  Defendants cite *Schloss v. City of Indianapolis*, 528 N.W.2d 1143 (Ind. Ct. App. 1988) (*Schloss I*) in support of their position.

In *Schloss I*, an Indianapolis resident and cable subscriber brought suit against the city, claiming that the City's imposition of a 3% franchise fee on the cable operator, which the operator passed on to subscribers, exceeded a limitation imposed by state statutes.  528 N.W.2d at 1143.  The state statute in question provided that governmental units do not have power "to impose a license fee greater than that reasonably related to the administrative cost of exercising a regulatory power."  *Id*. at 1143, n.1 (citing Ind. Code § 36-1-3-8).  The City conceded that the Indiana Code provision and § 542 could be interpreted to permit lesser franchise fees than

---

[3] "Franchising authority" is defined as "any governmental entity empowered by Federal, State, or local law to grant a franchise."  47 U.S.C. § 522(10).

authorized by § 542.  *Id*. at 1147.  The City, however, argued that this interpretation would obstruct the purpose of the statutory scheme set out in § 521.[4]  Specifically, the City argued that § 542(g) makes clear that the franchise fee is based solely upon the franchisee's status as such, and need not be related to costs of regulating the franchise, meaning that Congress intended to allow a local authority to charge any fee up to the 5% cap set by § 542(b).  *Id*.

Schloss countered that nothing in the legislative history of the Federal Cable Act indicated that Congress intended to preclude local regulations tying franchise fees to the cost of regulation.  *Id*.  The Indiana Court of Appeals, noting that § 556 clearly showed an "intent *not* to occupy the complete field of cable television franchising," nonetheless sided with the City.  *Id*. at

---

[4]  47 U.S.C § 521 provides that the "purposes of this subchapter" are to:

    (1)      establish a national policy concerning cable communications;

    (2)      establish franchise procedures and standards which encourage the growth and development of cable systems and which assure that cable systems are responsive to the needs and interests of the local community;

    (3)      establish guidelines for the exercise of Federal, State, and local authority with respect to the regulation of cable systems;

    (4)      assure that cable communications provide and are encouraged to provide the widest possible diversity of information sources and services to the public;

    (5)      establish an orderly process for franchise renewal which protects cable operators against unfair denials of renewal where the operator's past performance and proposal for future performance meet the standards established by this subchapter; and

    (6)      promote competition in cable communications and minimize unnecessary regulation that would impose an undue economic burden on cable systems.

*Id*.

1148 (emphasis added).  The *Schloss I* court found that, "[b]ecause only the FCC was regulating franchise fees when Congress enacted the Cable Communications Policy Act of 1984 we think it was not within the contemplation of Congress to vacate the field and permit state regulation of franchise fees."  *Id*. at 1149.

The decision of the Indiana Court of Appeals was vacated by a subsequent decision of the Indiana Supreme Court, *Schloss v. City of Indianapolis*, 553 N.W.2d 1204 (Ind. 1990) (*Schloss II*).  Regarding the preemption issue, however, the *Schloss II* court found it unnecessary to revisit the appellate court's analysis.  553 N.W.2d at 1207.  Rather, the court concluded that the Indiana Code did not apply to the city's cable television franchise fee in the first instance:

> The city's authority to accept franchise fees from the cable companies stems from its power to enter into contracts with those companies and not from its power to issue licenses and charge fees tied to regulatory costs.
>
> In reaching the conclusion that the cable franchise is not a license, we begin with the hornbook definition of a license:
>
>> A permit, granted by an appropriate governmental body, generally for a consideration, to a person, firm, or corporation to pursue some occupation or to carry on some business subject to regulation under the police power.  A license is not a contract between the state and the licensee, but is a mere personal permit.  Black's Law Dictionary 829 (5th ed. 1979) (citation omitted).
>
> A license fee is the consideration given for the receipt of the permit.  It must be related to the government's cost for regulating the occupation or business. *Northern Indiana Coin Operators Ass'n v. South Bend* (1985), Ind. App., 478 N.E.2d 704, 706 (citing Ind. Code § 36-1-3-8 (1982)).
>
> Indianapolis grants licenses and exacts regulation-related fees for a wide variety of business activities: it licenses the right to run massage parlors, operate taxicabs, deal in secondhand goods, and sell beverages, flowers, and foods from carts.  Each type of license is granted to a number of people in anticipation of competition among them.  Every person wishing to engage in a licensed business must follow certain procedures set by ordinance and pay a fee.  Indiana Code § 36-1-3-8(5) applies to this type of a set fee, one assessed against numerous people in exchange for the

opportunity to compete in the marketplace.

The agreements between the city and the cable companies are quite different from these licenses. The agreements involved in this case are franchise contracts. In these contracts, the city has granted to the cable operator both the right to sell cable television services in a particular area to the exclusion of other operators and the privilege of using the public ways of the city for the purpose of constructing and operating the cable television systems in the territory covered. The quid pro quo for the grant of these two significant privileges is the payment of a franchise fee.

*Id*. at 1207 (some citations omitted). Thus, the Indiana Supreme Court concluded that the Indiana statute at issue did not limit, in any way, the franchise fees that could be assessed. Rather the only limits on the fee came from certain state and county ordinances setting the fee at three percent of gross accrued revenues, and § 542(b) of the Cable Act which establishes a national cap at five percent of gross revenues. *Id*. at 1208.

Plaintiffs urge the Court to reject *Schloss I* and instead cite *City of Chicago v. Comcast Cable Holdings, L.L.C.*, 384 F.3d 901 (7th Cir. 2004) as dispositive authority on which this Court should rely. In *Comcast*, the City of Chicago brought an action in state court against cable operators seeking a declaratory judgment that the operators had to pay 5% of their revenues from broadband internet service as a franchise fee. 384 F.3d at 902-03. The cable operators removed the matter to federal court, asserting that the claim "arose under" federal law. *Id*. at 903. The federal appellate court reversed a district court decision maintaining the case in federal court, and remanded the case to state court:

Section 542(a) does not suggest that only federal law could support a claim. Unlike, say, the National Bank Act, which knocks out all state regulation of national banks' interest charges, so that any claim must rest on federal law alone, the Federal Communications Act leaves to state law most questions about the regulation and taxation of cable TV franchises. Section 542(a) does not purport to override state law, let alone to deny states all power in the field. So if, for example, Illinois law capped fees at 3%, Chicago could not rely on § 542(a) to charge 5%. All § 542(b)

does is limit authority that has some other source.  If § 542(b) makes the City's claim
a federal one, then any statute preempting state law would allow removal, and
decisions such as *Mottley*, *Gully*, and *Franchise Tax Board* would be overthrown.

*Id.* at 905.

In the present case, the Iowa statutes at issue, and upon which the holding in *Kragnes*

was based, are Iowa Code §§ 364.2 and 364.3.  Iowa Code § 364.2(4)(a) provides that a "city

may grant to any person a franchise to erect, maintain, and operate plants and systems for . . .

electric light and power, heating, telegraph, cable television . . . within the city for a term of not

more than twenty-five years."  Iowa Code § 364.3(4) provides that a city "may not levy a tax

unless specifically authorized by state law."  The *Schloss* cases are distinguishable from the

present case, both because the analysis applied in *Schloss I* was vacated (though not explicitly

rejected) by the Indiana Supreme Court, and because the interpretation of the legal effect of

franchises in Iowa is substantially different than that in Indiana.  The Indiana Supreme Court

emphasized that franchise fees comprise essentially a "quid pro quo" offered in exchange for the

right to sell services in a particular area and for the right to use public ways of the city in

constructing and operating such service.  *Schloss II*, 553 N.W. at 1207.  The *Kragnes* court,

however, emphasized that Iowa case law "has consistently held a license fee, permit fee, or

franchise fee is not a tax [only] so long as it is related to the reasonable costs of inspecting,

licensing, supervising, or otherwise regulating the activity that is being licensed, permitted, or

franchised."  *Kragnes*, 714 N.W. at 642.  As a natural corollary to this long standing principle,

the Iowa Supreme Court concluded that "[i]f the legislature thought it would be good public

policy to allow a city to raise revenue by charging a franchise fee in excess of the reasonable

costs of inspecting, licensing, supervising, or otherwise regulating the activity, the legislature

could have done so." *Id.*

Under Iowa law, then, it would be perfectly reasonable to believe that the franchise fees imposed on cable operators would be deemed a tax, just as the franchise fees imposed on MidAmerican were found to be taxes in *Kragnes*. The question remains, however, as to whether Iowa's requirement that franchise fees correspond to the costs of regulating the franchised activity is inconsistent with or otherwise frustrates federal law. Defendants urge that the Iowa Supreme Court's holding in *Kragnes* is inconsistent with the purposes of the Cable Act, and more specifically with the definition of "franchise fees" as "any tax, fee, or assessment of any kind imposed by a franchising authority . . . on a cable operator . . . solely because of their status as such." 47 U.S.C. § 542(g)(1). The Court disagrees.

The Court first addresses Defendants' argument that permitting states to require a link between the amount of the franchise fee and the cost of regulation would conflict with the purposes of the Federal Cable Act. It seems implausible that the purposes for the Federal Cable Act, articulated in 47 U.S.C. § 521—things such as "encourag[ing] the growth and development of cable systems"; "assur[ing] that cable systems are responsive to the needs and interests of the local community"; "establish[ing] guidelines . . . with respect to regulation"; "assur[ing] that cable communications provide . . . the widest possible diversity of information sources and services to the public"; and minimiz[ing] unnecessary regulation that would impose an undue economic burden on cable systems"—would be in any way impeded by a state law requiring that franchise fees be limited to the reasonable related costs. Indeed, as § 542 of the Federal Cable Act explicitly caps the amount of the franchise fee at 5%, it is counterintuitive to think that the purposes of the Act would somehow be impeded by states charging only two or three percent

-13-

because of the link to costs, rather than charging the higher maximum franchise fee articulated by federal law.  The potential that franchise fees would be lower due to state regulation seems more likely to further the purposes of the Act.

With regard to Defendants' argument that the present lawsuit is preempted because it conflicts with the definition of franchise fees, the Court again must disagree.  Certainly a franchising authority may impose a franchise fee on a cable operator, and such franchise fee may be imposed "solely because of [the cable operator's] status [as a cable operator]."  This does not imply, however, either implicitly or explicitly, that the *amount* of the fee, as opposed to the *fact* of the fee, cannot be subject to further conditions.

A review of the legislative history related to the enactment § 542 supports the conclusion that Congress did not intend to completely occupy the field of franchise fees as they relate to cable operators.  The House Report, dated August 1, 1984, discussing franchise fees on cable operators, notes that the legislation "establishes the authority of a city to collect a franchise fee of *up to* 5 percent of an operator's annual gross revenues."  H.R. Rep. No. 98-934, at 4663 (Aug. 1, 1984).  The legislation was further intended to strip the FCC of authority to "specify the manner in which the income from such fees may be spent."  *Id*.  The House Report also states: "In granting the authority to collect franchise fees up to 5 percent without an FCC waiver, the bill prohibits a franchising authority from requiring fees in excess of 5 percent, and *does not change* the provisions of existing franchises which specify a franchise fee *below* the 5 percent level *permitted* by this bill."  *Id*. at 4700-01 (emphasis added).  Likewise, a statement of Senator Robert Packwood before the Senate included similar indications that the 5% fee in § 542 was intended to be nothing more than a cap on the aggregate amount of franchise fees that could be

-14-

imposed on a cable operator in a year:  "The house amendment provided that for any 12-month

period, the franchise fees paid by a cable operator *shall not exceed* 5% of the . . . gross revenues .

. . .   The Senate adopts the House provisions . . . ."  1984 U.S.C.C.A.N. 4738, 4740 (Oct. 11,

1984) (emphasis added).  Even more compelling is language in a House report several years after

the enactment of the Federal Cable Act, stating:

> Of all media of mass communication, only cable television is subject to local
> regulation by franchising authorities. . . .  [I]n most cases, local regulation of cable
> television is conducted by city governments.  Federal law allows these locally
> elected officials or their agents to impose franchise fees of *up to* 5% of a cable
> operator's gross revenues.

H.R. Rep. No. 101-682 (Statement of Thomas J. Bliley, Jr., Sept. 6, 1990) (emphasis added).

## C.  *Arises Under*

Defendants next urge that Plaintiffs' claim "arises under" federal law, such that

jurisdiction in this Court is proper.  In *Franchise Tax Board of Cal. v. Construction Laborers*

*Vacation Trust*, 463 U.S. 1, 13 (1983), the United States Supreme Court held that "original

federal jurisdiction is unavailable [for a state law claim] unless it appears that some substantial,

disputed question of federal law is a necessary element of [the state claim alleged]."   The

doctrine of "arises under" jurisdiction "captures the commonsense notion that a federal court

ought to be able to hear claims recognized under state law that nonetheless turn on substantial

questions of federal law, and thus justify resort to the experience, solicitude, and hope of

uniformity that a federal forum offers on federal issues."  *Grable & Sons Metal Prods. v. Davre*

*Eng. & Mfg.*, 545 U.S. 308, 312 (2005).  Consistent with traditional jurisdictional analysis, the

determination of "whether a case is one arising under [federal law], in the sense of the

jurisdictional statute . . ., must be determined from what necessarily appears in the plaintiff's

statement of his own claim . . ., unaided by anything alleged in anticipation or avoidance of defenses which it is thought the defendant may interpose." *Taylor v. Anderson*, 234 U.S. 74, 75 (1914).

Noting that there is no single test to determine "arises under" jurisdiction, the *Grable* Court stated:   "[T]he question is, does a state-law claim necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable*, 545 U.S. at 314.  Defendants assert that each of the three *Grable* elements are satisfied in this case, such that the action actually "arises under" federal law for purposes of the jurisdictional analysis. Specifically, Defendants claim that the Franchise Agreements at issue between the Cities and the Plaintiffs each reference the Federal Cable Act, meaning that the Complaint actually does reference a federal issue.  Further, the Defendants claim, the parties are in agreement that construction of 47 U.S.C. § 542 will pose a "central legal issue" in this litigation, meaning that the federal issue is disputed and substantial.  Finally, Defendants assert, the Federal Cable Act was intended to establish a uniform national cable policy, meaning that the federal interest in the cable industry is large and would prevent the disruption of any equilibrium that now exists between state and federal courts.  As with Defendants' federal preemption argument, the Court must disagree.

First, the mere fact that Franchise Agreements reference the Federal Cable Act does not mean that the action arises under federal law, or even necessarily implicates federal law to any substantial extent.  Of course, in areas where the federal law and state law conflict, federal law will control.  In this case, however, Plaintiffs' allegation is based on an alleged violation of state

-16-

law, and as this Court found in its preemption analysis, federal law does not appear to completely occupy the field of franchise fees as they relate to cable operators.  At best, the provisions of the Federal Cable Act are asserted by Defendants as defenses to the state law violations alleged.  This is an insufficient implication of federal law on which to premise jurisdiction, i.e., the federal questions, while relevant, are not disputed and substantial, as required by *Grable*.  Finally, it appears clear that were the federal court to decide on the matters of state law asserted, there will certainly be some disruption in the balance of federal and state judicial responsibilities.  The Federal Cable Act itself lists as one of its goals the establishment of guidelines for not just Federal regulation of cable systems, but also for State and local regulations of cable systems.  *See* 47 U.S.C. § 521(3).  To the extent that Congress declined to occupy the entire field of regulation of cable operators and cable systems, it clearly intended to permit State and local authorities to play a substantial part in the regulation of cable services.

### D.  *47 U.S.C. § 555a*

Defendants next content that they enjoy immunity from any claims arising from their collection of franchise fees.  Defendants cite 47 U.S.C. § 555a(a) in support of this proposition.  Section 555a provides:

(a) Suits for damages prohibited

In any court proceeding pending on or initiated after October 5, 1992, involving any claim against a franchising authority or other governmental entity, or any official, member, employee, or agent of such authority or entity, arising from the regulation of cable service or from a decision of approval or disapproval with respect to a grant, renewal, transfer, or amendment of a franchise, any relief, to the extent such relief is required by any other provision of Federal, State, or local law, shall be limited to injunctive relief and declaratory relief.

47 U.S.C. § 555a(a).  In light of the fact that the Court has found it lacks jurisdiction to hear the

present case, there is no need to delve further into the question of whether § 555a(a) would permit the refund of franchise fees or the award of attorney's fees in the present case.

The federal statute in question clearly permits injunctive and declaratory relief.  While Plaintiffs seek a refund of illegally imposed franchise fees and attorney's fees, they also seek a declaration that the franchise fees collected are illegal and void, as well as an injunction prohibiting Defendants from enforcing and/or collecting illegal franchise fees in the future. These types of relief are clearly permitted by § 555a(a).  Regardless of whether a refund would constitute monetary damages, as Defendants allege, or a form of equitable injunctive relief, as Plaintiffs allege, the limitation in § 555a(a) is, at best, a defense to the damages alleged.  It is not, standing alone, a sufficient basis upon which this Court may exercise jurisdiction.  *See Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 63 (1987) (short of complete preemption, federal preemption is merely a defense that does not change federal court jurisdiction); *Franchise Tax Bd.*, 463 U.S. at 4 (holding that the defense of federal preemption is traditionally not a basis for removal); *Chapman*, 390 F.3d at 625.

## III.  CONCLUSION

For the reasons stated herein, the Court finds that Plaintiffs' Motion to Remand (Clerk's Nos. 3, 6, 7) is GRANTED.   Neither the federal preemption doctrine, nor the "arises under" analysis lead this Court to conclude that federal jurisdiction may be had over Plaintiffs' claim. The Clerk of Court shall, therefore, REMAND the above-captioned matters to the proper state courts.

IT IS SO ORDERED.

Dated this ___16th___ day of January, 2007.　　　ROBERT W. PRATT, Chief Judge
U.S. DISTRICT COURT